# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0751V

| | |
|---|---|
| BRANDON FARRIS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: April 16, 2024 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Alexa Roggenkamp, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On January 15, 2021, Brandon Farris filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he developed Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine that was administered on January 31, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although entitlement was conceded, the parties could not agree on all damages components, so the matter was designated for SPU "Motions Day," and argument was heard on March 28, 2024.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, and as represented during the hearing,[3] I find that Petitioner is entitled to compensation in the amount of **$184,899.43**, **representing $175,000.00 for past pain and suffering, $3,514.69 for past unreimbursable expenses, and $6,384.74 for lost wages.**

I.  **Pain and Suffering**

   A. **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering, and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages

---

[3] *See* Minute Entry dated April 16, 2024. The transcript of this hearing, which was not yet filed as of the date of this Decision, is hereby incorporated into this Damages Decision by reference.

in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### B. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavits, written briefs, and argument at the March 28th Motions Day hearing. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. Based upon the above, I note and find the following:

- Petitioner was administered both the flu and Tdap[4] vaccines on January 31, 2019, at Drive Wellness. Ex. 1 at 1. He was 43 years old at the time. *See* Ex. 2 at 19.

- On February 11, 2019 (11 days post-vaccination), Petitioner went to Dr. Tan's Walk-In Medical Center reporting a six-day history of congestion and muscle aches. Ex. 12 at 2-5. Petitioner was assessed with an upper respiratory infection and a "[p]ossible reaction to [f]lu vaccine." *Id.* at 4. He was administered a Kenalog injection and instructed to follow-up with his primary care caregiver. *Id.*

- Later that day, on February 11, 2019, Petitioner went to San Ramon Regional Medical Center's emergency department with a three-to-four-day history of generalized body aches. Ex. 9 at 3-6. Petitioner reported that he had spoken with his doctor and that he was "experiencing intermittent numbness between his toes bilaterally without any other proximal symptoms." *Id.* at 3. The medical record indicates that Petitioner "look[ed] well" and that there was "low suspicion of [GBS]." *Id.* at 6.

- On February 13, 2019, Petitioner was seen by Dr. Howard Yoshioka at Stanford

---

[4] Petitioner does not allege that the Tdap vaccine is related to his later development of GBS. Petition at 1.

Health Care. Ex. 5 at 54-60. He complained of generalized weakness and "pain to bilateral thighs and the dorsum of both feet." *Id.* at 54. It was also noted that Petitioner had difficulty urinating and complained of nausea and a mild headache. *Id.* Dr. Yoshioka noted that Petitioner "underwent lumbar puncture without complication" and opined that Petitioner's injury "might be transverse myelitis or GBS syndrome although unusual for GBS to give pain localized to muscles. Also may have Rhabdomyolysis causing his pain." *Id.* at 58-59.

- Petitioner was also seen by Dr. Weihan Chu on February 13, 2019. Ex. 5 at 80-85. Petitioner reported that after receiving the flu shot, he "developed bilateral [left extremity] tingling, difficulty walking, generalized weakness and upper extremity weakness." *Id.* at 80. Petitioner further reported diffuse myalgia "like [he] was getting the flu." *Id.*

- Also on February 13, 2019, Petitioner was evaluated by Dr. Stan Tsong-Huei Lin, a neurologist, for "acute onset of pain and progressive weakness of bilateral extremities, suspected [GBS]." Ex. 5 at 139-142. Dr. Lin noted that although Petitioner's clinical syndrome was "most compatible with a diagnosis of acute inflammatory demyelinating polyneuropathy (AIDP) due to GBS . . . the clinical picture descending instead of ascending weakness is atypical." *Id.* at 142. A five-day course of intravenous immune globulin ("IVIG") was recommended. *Id.*

- Petitioner was transferred to Stanford Health's critical care unit on February 14, 2019 and was examined by Dr. John Wai Ying Yee for the chief complaint of "[p]rogressive weakness from [GBS]." Ex. 5 at 85-91. Dr. Yee noted that an MRI of Petitioner's cervical and lumbar spine showed "multilevel enhancement along the ventral nerve root, indicative of possible infectious, inflammatory or autoimmune neuropathy, inclusive of [GBS]. *Id.* at 86. Petitioner was assessed with "acute inflammatory demyelinating polyneuropathy (AIDP)/GBS [w]ith quadriplegia" and low back pain. *Id.* at 91.

- A Drive Wellness note, dated February 15, 2019, indicates that Petitioner's wife called to report that Petitioner was hospitalized because of suspected GBS. Ex. 2 at 28. Drive Wellness reported the incident to the vaccine adverse event reporting system. *Id.* at 27-28.

- Between February 15 and February 19, 2019, Petitioner underwent five days of IVIG treatment. Ex. 5 at 230, 235, 248, 263, 275, 526-529. A medical note detailing Petitioner's hospital stay indicates that "[Petitioner's] weakness was noted to fluctuate in its severity after completion of his IVIG, thereby prompting Nephrology consult on 2/23 for possible initiation of plasmapheresis given concerns of disease

4

progression. However . . . plasmapheresis was deferred given that [Petitioner] has since improved. [Petitioner] continues to have significant weakness of all extremities . . . but is gradually improving." *Id.* at 94-95.

- Petitioner was seen by Dr. Charlene Hu at Stanford Valley Care Neurology on February 26, 2019. Ex. 5 at 134-138. Dr. Hu's notes reflect that Petitioner "acutely developed pain and weakness on Feb 8, started IV Ig on Feb 13, but Cont' getting worse until Feb 18, 2019, then fast improving since then, with some fluctuation." *Id.* at 134. Nevertheless, Dr. Hu noted that Petitioner still experienced pain "at the thighs and low back" and that he continued to experience difficulty manipulating his fingers. *Id.* On exam, Petitioner's speech was soft and he exhibited "significant ataxia . . . on both UE and hands, with very poor fine motor" skills. *Id.* at 137. Dr. Hu opined that Petitioner's GBS was improved at 60-65% and was assessed with "elevated LFT" and "[n]europathic pain." *Id.* at 138.

- During his inpatient stay, Petitioner underwent intensive physical therapy, occupational therapy, speech language therapy, consultations with neurology, nephrology, hepatology and gastroenterology. Ex. 5 at 1-274, 382.

- On February 27, 2019, Petitioner was admitted to John Muir Medical Center for inpatient rehabilitation services. Ex. 3 at 24. On admission, he showed "weakness in all limbs" and was noted to be "functioning well below his usual baseline." *Id.* at 25. Petitioner required placement of a nasogastric tube for feeding and wound care for a gluteal cleft. *Id.* at 341.

- Petitioner was discharged from John Muir Medical Center on March 16, 2019. Ex. 3 at 16-23. The discharge note indicates that Petitioner could function independently or independently with modification on all aspects of his Functional Independency Measurement. *Id.* at 19-20. The discharge note further indicates that Petitioner could walk with the assistance of a gait belt, front wheel walker or hiking poles. *Id.* at 20.

- Petitioner was seen by Dr. Erik Gracer, a family medicine physician, on March 18, 2019. Ex. 11 at 34-41. The medical notes indicated that Petitioner had atrophy of the bilateral lower extremities and an abnormal gait. *Id.* at 36. Dr. Gracer remarked that Petitioner had been walking with the assistance of a cane and continued to have "persistent waxing and waning pain to his lower back throughout the day." *Id.* at 34. Petitioner rated his pain as a five on a ten-point scale but noted that it "will become 7/10 when lying on his back." *Id.* Petitioner was again diagnosed with GBS and tramadol. *Id.* at 40.

5

- On April 9, 2019, Petitioner called Drive Wellness to confirm that his GBS diagnosis had been reported to VAERS. Ex. 2 at 26. The phone note indicates that this injury had been reported that that Petitioner "is feeling better and is optimistic for his recovery." *Id.*

- On April 18, 2019, Petitioner returned to San Ramon Family Medicine Center for a follow up visit with Dr. Gracer. Ex. 11 at 26-30. The medical note indicates that Petitioner was "walking daily and is trying to maintain active although he moves slow." *Id.* at 26. The medical note also reflects that Petitioner was "able to care for himself and maintain activities of daily living. No falls. No longer using cane." *Id.* at 26-27.

- Petitioner underwent an initial physical therapy evaluation on April 23, 2019. Ex. 10 at 53. Petitioner reported that his primary concern was "[m]obility and ambulation, in particular" and it was noted that his "[s]ymptoms prevent [his] ability to independently walk long distances with safety and stability." *Id.* Petitioner described "center lower back, right thigh, left thigh pain as aching, weak" and rated his pain, at worst, as a six on a ten-point scale. *Id.* At best, his pain was rated as a three on the same ten-point scale. *Id.*

- Petitioner attended ten physical therapy appointments through June 10, 2019. Ex. 10 at 50. The discharge summary, dated July 23, 2019, indicates that Petitioner had returned to swimming at least 3,000 yards and that his "[c]adence and distance walking" had improved. *Id.* at 50. Petitioner was also noted to be "[f]eeling stronger." *Id.*

- Petitioner was seen by Dr. Stan T. Lin, a neurologist, on May 3, 2019 for "follow-up of AIDP due to [GBS]." Ex. 6 at 5-8. Dr. Lin noted that Petitioner continued to recover most of his strength, "except for residual right shoulder weakness and mild weakness in the lower extremities." *Id.* at 5. Petitioner's physical exam revealed "mild proximal weakness in the hip flexors, more on the left" and "weakness in the bilateral toe extensors." *Id.* It was further noted that Petitioner would likely return to work within a month and that while he was able to walk without assistance, he was unable to walk on his heels or toes. *Id.*

- Petitioner was again seen by Dr. Gracer on May 30, 2019. Ex. 11 at 20-23. The notes documenting this appointment indicate that although Petitioner was "feeling generally well," he was "not back to his previous baseline." *Id.* at 20. It was further noted that he "continue[d] to have back pain and generalized fatigue with loss of range of motion to the [right] shoulder and arm." *Id.*

6

- On August 30, 2019, Petitioner attended an additional appointment with Dr. Gracer. Ex. 11 at 15-17. Petitioner reported that despite a continuation of decreased range of motion in his right arm, he had seen an overall improvement and recently returned to work. *Id.* at 15. Petitioner also reported that he was "waking up frequently throughout the night" due to what he believed might be ongoing anxiety. *Id.*

- Petitioner received treatment for insomnia on January 30 and June 11, 2020. Ex. 11 at 4-6, 9-10.

- On April 16, 2021, Petitioner was seen via a telehealth visit by Dr. Gracer for a "[s]houlder [p]roblem." Ex. 14 at 1-2. Petitioner reported that he had "ongoing soreness" in his right shoulder and decreased range of motion, "weakness with overhead activities," with the "feeling that [his] muscles don't react as well-can't move as fast or as quickly." *Id.* at 1. Petitioner was assessed with chronic right shoulder pain and a winged scapula on his right side. *Id.* at 2. Dr. Gracer noted that Petitioner was still experiencing "generalized weakness with some residual weakness" status post "GBS 2019." *Id.*

- In Petitioner's December 21, 2022 affidavit, he states that his GBS caused a setback in his career. Ex. 17 at 1. Specifically, he avers that prior to his injury, he managed six people and was on a trajectory to get a promotion – however, after taking three months off to recover from his illness, he struggled physically and mentally and was unable to maintain the same work schedule. *Id.* Petitioner further avers that after realizing that he could no longer continue in his same role, he found another position with fewer responsibilities and less pay. *Id.* Petitioner also avers that while he continues to swim for exercise and relaxation, it is no longer possible for him to swim competitively. *Id.*

- In Petitioner's March 22, 2024 affidavit, he states that he continues to suffer from permanent nerve damage to his right shoulder blade and avers that "my life has been reshaped by [GBS] leaving indelible marks on my physical and emotional well-being, as well as my professional trajectory and recreational pursuits." Ex. 18 at 2.

Petitioner's medical records and affidavits provide a credible description of the pain he experienced throughout the duration of his injury. Petitioner asserts that he "suffered a dramatic injury which has greatly impacted his health and his life as a whole," and that his "lengthy in-patient treatment, intense suffering at the nadir of the GBS, and persisting sequela" warrant an award of $250,000.00 (the statutory maximum) for his pain and suffering. Brief at 7, Reply at 15.

7

Respondent on the other hand, argues that "[Petitioner's] clinical course and treatment documented by his medical records demonstrates a less severe course of GBS than others, comparatively speaking." Response at 9. As a result, Respondent proposes a pain and suffering award of no more than $114,500.00.

As I have noted in prior decisions, GBS constitutes a particularly frightening type of vaccine injury – and, as a result, a higher-than-average pain and suffering award is appropriate. *See Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2021). Nevertheless, "considerations that always impact how a pain and suffering award is calculated – level of pain, length of hospitalization and inpatient rehabilitation, degree and number of procedures for treatment, duration of treatment, and overall recovery – bear . . . on the final figure to be awarded." *Weidner v. Sec'y of Health & Human Servs.*, 2023 WL 8110729, at *6 (Fed. Cl. Spec. Mstr. Oct. 13, 2023). Here, Petitioner's injury required intrusive treatment, including hospitalization for fifteen days, a five-day course of IVIG, an MRI, and consultations with various specialists. Petitioner also spent seventeen days in in-patient rehabilitation (where he endured a nasogastric tube for feeding), participated in physical therapy, and consistently sought follow-up treatment for his ongoing symptoms throughout the spring and summer of 2019. While Petitioner experienced "some decreased range of motion in his right arm" during an August 30, 2019 exam, he was nonetheless noted to have improved overall. And while Petitioner maintains that he continues to suffer from the residual effects of GBS, the final treatment record is dated April 16, 2021 (approximately two years after the start of his symptoms). At that time, Petitioner was assessed with chronic right shoulder pain, a winged scapula on his right side, and generalized weakness.

Petitioner did not offer any comparable reasoned decisions in which $250,000.00 was awarded for pain and suffering for a person who experienced GBS but without notable and irreversible deficiencies. Instead, he cites *Graves*, 109 Fed. Cl. at 592, for the proposition that pain and suffering should not be determined on a continuum "with only the most severely injured receiving the maximum award and those with lesser injuries receiving lower awards." Brief at 7. Although *Graves* does not control the outcome of this case, "it offers a reasoned understanding of the issues involved in pain and suffering calculations and underscores the importance of evaluating pain and suffering *first and foremost* on the basis of the injured party's own experience." *See, e.g., Alonzo v. Sec'y of Health & Human Servs.*, No. 18-1157V, 2023 WL 5846682 at *11 (Fed. Cl. Spec. Mstr. Aug. 14, 2023). Nevertheless, I also consider cases involving similarly situated petitioners in my determination of an appropriate award for pain and suffering. *See supra* at Part II(A).

To that end, Respondent presented one case for comparison in his brief (*Shankar v. Sec'y of Health & Human Servs.*, No. 19-1328V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022) (awarding $135,000.00 for pain and suffering) and, only three days prior to the hearing, filed an additional comparable (*Granville v. Sec'y of Health & Human Servs.*, No. 21-2098, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023)(awarding $92,500.00 in pain and suffering). However, I find that the facts of those cases are distinguishable, and Respondent's recommended award of $114,500.00 to be too modest. Moreover, while Petitioner cites to *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) for the proposition that a negative effect on a petitioner's career should be taken into account, the parties have reached an agreement on an award for lost wages, and overall I do not in this case discern circumstances that suggest the pain and suffering award should take into account those kinds of considerations.

I find that Petitioner's course of treatment is most similar to the petitioner in *Longo*, where a pain and suffering award of $160,000.00 was granted. *Longo v. Sec'y of Health & Human Servs.*, No. 21-844, 2023 WL 9326039 (Fed. Cl. Dec. 20, 2023). The *Longo* petitioner experienced a mild-to-moderate case of GBS which was promptly diagnosed and for which he received appropriate treatment with IVIG. Although the *Longo* petitioner underwent more physical therapy than Mr. Farris (36 sessions in approximately four months), like Petitioner, he experienced a good recovery despite reporting mild symptoms for at least two years. Nevertheless, his course of hospitalization was less than Mr. Farris's (six days instead of fifteen), and he did not require in-patient rehabilitation. These differences militate in favor of a higher award.

Accordingly, balancing the severity and overall course of Petitioner's moderate GBS injury, and considering the arguments presented by both parties at the hearing, a review of the relevant caselaw and the written record, I find that $175,000.00 in total compensation for actual pain and suffering is reasonable in this case.

## II.   Award for Past Unreimbursable Expenses

Petitioner also requests $3,514.69 in past unreimbursable expenses. Brief at 15. Respondent does not dispute this sum. Response at 14. Therefore, Petitioner is awarded this amount without adjustment.

## III.   Award for Lost Wages

Petitioner requests $6,384.74 in lost earnings. Brief at 15. Respondent does not dispute this sum. Response at 14. Therefore, Petitioner is awarded this amount without adjustment.

**Conclusion**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $184,899.43, (representing $175,000.00 for Petitioner's past pain and suffering, $3,514.69 for past unreimbursable expenses, and $6,384.74 for lost wages) in the form of a check payable to Petitioner, Brandon Farris.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[5]

**IT IS SO ORDERED.**

                                            **s/Brian H. Corcoran**
                                            Brian H. Corcoran
                                            Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.